MADELYN E. COUSENS *vs.* THEODORE S. WATSON, ET ALS.

Cumberland.      Opinion November 18, 1931.

*Skillin, Dyer & Payson,* for plaintiff.
*Drummond & Drummond,*
*William B. Mahoney,*
*Theodore Gonya,* for defendants.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, THAXTER, JJ.

Dunn, J. This case is here on report. This court is to say, from the legally admissible evidence, what the facts are, they being in dispute, and to apply the law to the facts, in final determination.

Defendants are stockbrokers, having offices in New York and Portland, who purchased Cities Service stock, by direction of the plaintiff, in various transactions, on margins, in contemplation of actual delivery to her.

The basic question of the case is:

Did defendants sell the stock on May 5, 1930, for insufficiency of margin, without notice to the plaintiff, after promising her that the stock would not be offered for sale on that day?

The answer to that question depends upon the action taken by the plaintiff's husband, William A. Cousens, as her agent, and James R. Hawkes, the manager of the Portland office of the defendants, on Saturday, May 3, 1930.

On that Saturday, a few minutes before, or after, the hour of twelve o'clock, meridian, the closing time on Saturday of the New York stock exchange, Mr. Cousens knew that, because of a decided fall in the price of shares, the marginal deposit had become exhausted, and that more margin was required.

The plaintiff, when her dealings with defendants were begun, signed and delivered to them, a writing, the material part of which is as follows:

"Portland, Me., Oct. 15, 1929,

Watson & White,
Dear Sirs:

I hereby consent: . . . . . . . . . . . that on all marginal business you may close transactions and may sell all securities from time to time carried in my account or deposited to protect the same whenever the margin may be deemed insufficient by you, all without demand for margin, notice of the closing or of sale or of the time or place thereof."

The instrument was signed by the plaintiff only, but acceptance by the defendants completed the contract.

Upon plaintiff's deposit becoming inadequate, defendants could have agreed, as plaintiff charges they did agree, that they would

not immediately sell her stock, but would defer selling, to afford her opportunity to procure margin.

Whether, at the conference at noonday on May 3, there was mere notice by Mr. Hawkes that further margin was requisite, not stating the amount, to which Mr. Cousens rejoined he had securities to the market value of approximately $8,000 — or inquiry by Mr. Hawkes regarding what amount Mr. Cousens could raise, reply being $8,000, which the former asked the latter to bring in, not in full of marginal requirement, but on account — is in conflict in the testimony.

But, whatever the fact about it may be, the brief of counsel for the plaintiff frankly concedes inference to be fairly warranted that Mr. Hawkes was given to understand that Mr. Cousens would deposit $8,000 during the afternoon of May 3.

No deposit was made.

Mr. Cousens testifies that he went to the bank where his safety deposit box was, only to find the bank closed. There is testimony later, it may here be marked, that the bank was open, as customary, on Saturday evening.

At three o'clock in the afternoon, Mr. Cousens was again in defendants' office, coming from his home by request. Mr. Hawkes, when Mr. Cousens entered, was in telephonic communication with the New York office, concerning the Cousens account.

Once again, statements of witnesses conflict.

Mr. Hawkes' testimony is (1) that he asked Mr. Cousens for the $8,000, and the latter answered that he would go out and get it; (2) that he told Mr. Cousens there had been call from the New York office since noon for the total marginal requirement of $22,000; (3) that Mr. Cousens said that he would go to Bangor, where he thought he could get a loan on timberlands, and that he would advise Mr. Hawkes before the opening of the market on Monday, how the loan was progressing, that he might "verify with the bank and let New York know." Mr. Cousens left the office, but did not return up to midnight, to which time Mr. Hawkes attests he remained to receive the promised $8,000. On Saturday night or Sunday, he attempted to get in communication with Mr. Cousens by telephone, but was unsuccessful.

The version of Mr. Cousens is that when he stepped into the office Mr. Hawkes was telephoning; that Mr. Hawkes put his hand over the transmitter, and addressing the witness, said, "He wants to know how much money you can give him; tell him $8,000." "I," to quote the reply, "said yes."

Mr. Cousens says it was he himself, and not Mr. Hawkes who observed that the safety of the account called for more than $8,000; that he would feel easier if the deposit should be at least $20,000, and that it was probable he could procure money at Bangor. On his story, he was to get in touch with Mr. Hawkes from Bangor, not in advance of the market opening, because "it might not be fitting," that is, it might conflict with other business, but as early as he could, on Monday.

Mr. Cousens had with him a letter he had written to Mr. Hawkes, which he did not leave, but later mailed under registered cover, to reach the addressee on Monday morning. The letter recited, in substance, that a loan was to be negotiated, that the writer was obliged to go to Bangor, that he would be heard from again on Monday, and "warned or requested" that the account be not sold out in the meantime, and concluded, "Am absolutely financially responsible."

When the letter was received, Mr. Cousens was in Bangor, having gone to that city on Sunday, and his whereabout there was not known to Mr. Hawkes. Telephone calls to all the Bangor banks failed to locate him.

On Monday afternoon, at seven minutes before one o'clock, Mr. Cousens telegraphed Mr. Hawkes:

"Matters working O.K. Delayed some account check up."

Except for this, he remained silent that day. Tuesday, while still in Bangor, he obtained from a sister of his, bonds to the amount of $18,000. At eleven o'clock in the forenoon, he telephoned a Mr. Gilliatt, in Portland, and inquired how matters stood. He was told of the sale the day before.

Wednesday (the defense says Thursday), in Portland, Mr. Cousens personally protested the sale, and told Mr. Hawkes he was prepared to take care of the account. Mr. Hawkes said the stock had been sold. Plaintiff, nor her agent, neither tendered margin nor demanded stock.

Mr. Cousens went to New York and talked with the defendants, and upon returning to Portland wrote the local office, an effort which proved futile, to effect a compromise and reinstate the account. To speak further of this is unnecessary.

On May 16, 1930, Mr. Cousens asked the Portland office for the balance of the account, in other words, for the amount remaining to the credit of the plaintiff, after discharging her indebtedness to the defendants, on the close by them of the marginal transactions.

A check was drawn to the order of the plaintiff for $2,414.58. She accepted and endorsed the check; her husband also endorsed it. The check was paid by the bank on which it was drawn.

Such, in summary, is the evidence.

The rights of the parties were initiated by the marginal agreement. Unilateral as executed, it became, as has been noticed before, mutually dependent, and bound both plaintiff and defendants.

Defendants undertook and agreed, on their part, to carry and hold such stock as they might buy for the plaintiff, so long as her margin was kept good against the fluctuations of the market. This is unquestioned.

Counsel for plaintiff argue, however, that marginal agreement was modified, or at least action on May 3, 1930, was such as to estop the defendants from selling the stock on the next business day, in the absence of prior notice to the plaintiff, without responsibility in damages.

The argument is a strong one, but the case is too weak to bear it. The evidence does not preponderate in favor of the plaintiff.

When, because of the market recession, the margin of the plaintiff became impaired, the obligation of the defendants to hold the stock ceased.

Although not obliged by the contract to give notice of marginal shortage, defendants did so. Upon failure of plaintiff to make further deposit, right to sell the stock became absolute.

In selling, the defendants were bound to act fairly and with proper regard to the interests of the plaintiff. There is no evidence to warrant finding that they did not do so.

On the authority of the report, the entry will be,

*Judgment for defendants.*